IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DARWIN RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:13 C 3362 |
| | ) | |
| S.A. GODINEZ, et al., | ) | Judge Colin S. Bruce |
| | ) | |
| Defendants. | ) | Mag. Judge David Bernthal |

**PLAINTIFF DARWIN RAMIREZ'S RESPONSE TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON EXHAUSTION**

**Introduction**

Darwin Ramirez sued Western Illinois Correctional Center staffers (collectively "Western") for celling him with dangerous cellmates, retaliating against him for reporting his cellmates' threats, taunting him about his sexual orientation, and ignoring the risks that Spanish-only prisoners like him face in prison. He didn't file grievances on these issues because he didn't know what a grievance was.

He didn't know because Western didn't tell him. Western's orientation was useless for Ramirez. At the time, he was 18 and had been in the United States for less than a year. He spoke no English. In Honduras, where he came from, he worked on a farm instead of going to school. He was unable to read or write in English or Spanish. So, when Ramirez went through the verbal orientation in English and got an English rulebook, he couldn't understand a word of either. Despite its legal obligation to do so, Western never told Ramirez that there was a grievance process or how to use it.

Now Western wants to profit from that failure.  It seeks summary judgment based on the Prison Litigation Reform Act's exhaustion

requirement, arguing that Ramirez failed to exhaust his administrative remedies by failing to grieve the issues raised in this case. But prisoners only need to exhaust "available" remedies. And an administrative remedy isn't available to a prisoner if the prison fails to inform that prisoner about the remedy in a language that the prisoner can understand. Here, Western never informed Ramirez about the grievance process in Spanish. Accordingly, the grievance process wasn't available to him and Western's motion for summary judgment should be denied.

### Response to the Defendants' Undisputed Material Facts

Under Local Rule 7.1(D)(2), Ramirez submits these additional material facts and responds to Western's statement of facts using the same fact numbers as Western's statement. Ramirez's additional facts begin with number 19, as Western's statement ended with number 18.

*Plaintiff's Additional Material Facts*

<u>Honduras to Western Illinois</u>

19.   When he was 17 years old, Darwin Ramirez came to the United States from Honduras, where he had worked on a farm. Ex. 2 (Dec. of D. Ramirez) at ¶¶ 1-2.

20.   Because Ramirez worked on a farm, he rarely went to school. *Id.* ¶ 5.

21.   He never studied English. *Id.*

22.   He spoke no English when he came to the United States. *Id.* ¶ 4.

23.   He could speak Spanish. *Id.* ¶ 6.

24.  But he could not read or write in Spanish. *Id.*

25.  Seven months after Ramirez came to the United States, he was arrested. *Id.* ¶ 7.

26.  At the time he was arrested, Ramirez was 17 or 18. *Id.*

27.  From the time he was arrested until now, Ramirez has been incarcerated. *Id.* ¶ 8.

28.  At first, Ramirez was locked up in the Cook County Jail. Later, he was transferred to Western, where he remains. *Id.*

<u>Ramirez at Western</u>

29.  Ramirez was transferred to Western in 2008. *Id.* ¶ 9.

30.  When Ramirez arrived at Western, he could not understand, speak, or read English. *Id.* ¶ 10(a).

31.  When Ramirez arrived at Western, he could not read or write in Spanish. *Id.* ¶ 10(b).

32.  When Ramirez arrived at Western, no one asked him whether he spoke English. *Id.* ¶ 10(c).

33.  When Ramirez arrived at Western, no one asked him whether he could read in Spanish or in English. *Id.* ¶¶ 10(d) & (e).

34.  When Ramirez arrived at Western, he was given a rulebook that was in English except for a Spanish blurb about wiring money through Western Union. *Id.* ¶ 11.

35.  Ramirez could not read that rulebook. *Id.*

36.  No one asked Ramirez if he could read or understand the rulebook. *Id.* ¶ 12.

37.   To this day, Ramirez has never seen a Spanish rulebook or anything like a Spanish rulebook. *Id.* ¶ 13.

38.   About the same time that he was given the English rulebook, Ramirez was taken to a room where a staff member spoke to a group of prisoners in English. No part of the talk was in Spanish. *Id.* ¶¶ 16, 17.

39.   Ramirez could not understand what the staff member said. *Id.* ¶ 16.

40.   After the staff member's talk, no one asked Ramirez if he had understood what was said. *Id.* ¶ 17.

41.   After the talk, staff made Ramirez sign something that he now believes is the "Offender Orientation Receipt" produced in this litigation. *Id.* ¶ 18; Ex. 7 (Offender Orientation Receipt).

42.   When he first got to Western, no one explained the grievance process to Ramirez in Spanish, no one mentioned it by name, and no one told him what it was. Ex. 2 (Dec. of D. Ramirez) at ¶ 19.

43.   Accordingly, he did not know there was such a thing as a grievance process. *Id.*

44.   Ramirez did not know there was a way to complain about things at the prison other than by just trying to tell staff what was wrong. *Id.*

45.   Ramirez coped with his ignorance of the rules by mimicking other prisoners and eventually learning enough of the prison routine to get by. *Id.* at ¶¶ 22, 40.

46.   Still, Ramirez occasionally got in trouble for breaking rules he was unaware of. *Id.* ¶ 23.

47.   For example, earlier this year, Ramirez was disciplined for having too many colored pencils. Ex. 10 (Colored Pencil Discipline Documents) at 22-25.

48.   Ramirez's explanation for why he kept too many colored pencils was that he "didn't know rules." Ex. 10 (Colored Pencil Discipline Documents) at 22-23.

49.   In 2010, after 2 years at Western, Ramirez still required an interpreter for things like disciplinary hearings. Ex. 8 (Final Summary Report: 7/8/2010).

50.   Despite Ramirez's problems with the rules, and Ramirez's explanation that he didn't know the rules, never did anyone at Western think to ask whether he understood English well enough to read the rulebook or to have understood orientation. Ex. 2 (Dec. of D. Ramirez) at ¶ 23.

51.   Shortly after he arrived at Western, Ramirez spoke with Julia Vincent in Spanish about his immigration status. *Id.* ¶ 24.

52.   Even though his lack of English was obvious, Vincent did not ask Ramirez whether he understood Western's rules or had understood orientation. *Id.*

53.   Vincent is the only Western staff member that Ramirez has ever spoken Spanish with. *Id.* ¶ 25; Ex. 5 (Def. Williams's Resp. to Plaintiff's 1st Interrogatories) at Interrogatory No. 5.

<u>Ramirez's Experience of Western is Typical</u>

54.  Ramirez's orientation experience is typical of a Spanish-speaking prisoner at Western. Ex. 2 (Dec. of D. Ramirez) at ¶¶ 9-26.

55.  Other than the English-language orientation and rulebook, Western takes no steps to ensure that prisoners who do not speak or read English are made aware of the grievance policy. Id. ¶¶ 34-39; Ex. 5 (Def. Williams's Resp. to Plaintiff's 1st Interrogatories) at Interrogatory No. 5.

56.  Since 2008, Western has had no written policies, practices, or procedures for assessing the English ability of prisoners when they arrive at the prison. Ex. 6 (Def. Williams's Resp. to Plaintiff's 1st Requests for Production) at Request No. 9.

57.  Since 2007, Western has had no written policies or practices in place to ensure that it meets its obligation under 20 Ill. Admin. Code § 504.810(d) to ensure that "[o]ffenders shall be informed of the grievance process at the admitting facility." *Id.* at Request No. 29.

58.  Since 2007, Western has had no written policies or practices in place to ensure that it meets its obligation under 20 Ill. Admin. Code § 504.810(c)(2) to ensure that "[e]ach facility shall take reasonable steps to ensure that the grievance process is accessible to offenders who are impaired, disabled, or unable to communicate in the English language." *Id.* at Request No. 30.

59.  The only document that has ever been available at Western that explains any part of the grievance process in Spanish is an

"Inmate Orientation Manual in Spanish" which Western admits was not regularly made available. Rather "it was available for a period to inmates," but Western does not know when that period was. Ex. 5 (Def. Williams's Resp. to Plaintiff's 1st Interrogatories) at Interrogatory No. 5; Ex. 6 (Def. Williams's Resp. to Plaintiff's 1st Requests for Production) at Request No. 31.

60.   Since Ramirez has been there, Western has only had one Spanish-speaking employee: Julia Vincent. Ex. 5 (Def. Williams's Resp. to Plaintiff's 1st Interrogatories) at Interrogatory No. 3.

61.   Western claims that a Spanish-language grievance form is available, but Ramirez had never seen one until his counsel showed him one produced in discovery. Ex. 2 (Dec. of D. Ramirez) at ¶ 15.

<u>The June 2011 Incident</u>

62.   In June 2011, Ramirez's cellmate threatened him with a shank in their cell. *Id.* ¶ 26.

63.   Ramirez ran away and tried to explain what happened to a correctional officer. *Id.*

64.   The officer ordered Ramirez back to his cell and, when Ramirez refused to go, took Ramirez to segregation as punishment for refusing the order. *Id.;* Ex. 9 (Final Summary Report: 6/9/2011).

65.   Ramirez spent three days in segregation and then had a disciplinary hearing. Ex. 2 (Dec. of D. Ramirez) at ¶ 27; Ex. 9 (Final Summary Report: 6/9/2011).

66.   Julia Vincent was at the hearing. Ex. 2 (Dec. of D. Ramirez) at ¶ 27; Ex. 9 (Final Summary Report: 6/9/2011).

67.   At the hearing, Ramirez explained to Vincent in Spanish what happened with his cellmate. Ex. 2 (Dec. of D. Ramirez) at ¶ 27; Ex. 9 (Final Summary Report: 6/9/2011).

68.   Vincent and the other hearing officers decided that being threatened with a shank was not a good enough reason for Ramirez to have refused to go back to his cell, so they put Ramirez in segregation for almost two more weeks. Ex. 2 (Dec. of D. Ramirez) at ¶ 27; Ex. 9 (Final Summary Report: 6/9/2011).

69.   Ramirez did all he knew how to do to complain about his cellmate and how he was put in segregation for seeking help. All he knew how to do was try to explain the situation to the correctional officer and to Vincent. Ex. 2 (Dec. of D. Ramirez) at ¶ 28.

70.   At the disciplinary hearing, no one asked Ramirez whether he wanted to complain or file a grievance. No one thought to ask Ramirez whether he understood the situation or the rules. *Id.* ¶ 29.

71.   At the time of the hearing, Ramirez still did not know that there was such a thing as the grievance process. *Id.* ¶¶ 30-31.

72.   If Ramirez had known, he would have filed a grievance. *Id.*

## Ramirez Learns of the Grievance Process

73.  Ramirez was first celled with Carl Tate in the summer of 2013. *Id.* ¶ 32.

74.  Tate speaks Spanish and English. *Id.*

75.  As Ramirez and Tate were getting to know each other, Ramirez told Tate about what had happened to him in June 2011 and about his other issues at Western. *Id.* ¶ 33.

76.  Tate asked Ramirez if he had filed grievances about those issues. *Id.*

77.  That was the first Ramirez had heard of grievances, so he asked Tate what a grievance was and Tate explained. *Id.*

78.  At that point it was too late to file grievances about the claims in this lawsuit. Grievances must be filed within 60 days, *see* 20 Ill. Admin. Code § 504.810(a) ("[a] grievance shall be filed within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance"), and the claims in Ramirez's complaint were well over 60 days old when Ramirez was first celled with Tate. Ex. 4 (First Amended Complaint) at ¶¶ 13-23.[1]

---

[1] This is so except for Ramirez's claims based on harassment by Correctional Officer Alexander that occurred after Ramirez was celled with Tate. Ex. 4 (First Amended Complaint) at ¶¶ 24-27. The grievance process was unavailable to Ramirez as to these claims under *Kaba v. Stepp*, 458 F.3d 678, 685 (7th Cir. 2006) ("it was unrealistic to expect him to file a grievance against the very people who were threatening retaliation"); because he was still being refused adequate assistance, *see* Response to Fact # 15; and because Tate's assistance was not a sufficient substitute for Western's, *see* footnote 2 *infra*.

79.  After Tate explained to Ramirez what grievances were, Ramirez, with Tate's help and the help of other prisoners, began to file them on other issues. Ex. 2 (Dec. of D. Ramirez) at ¶ 34.

80.  That is why every grievance Ramirez has filed post-dates the summer of 2013. *Id.* ¶ 34; Dkt. 51-3 at 1-14 (grievances filed with Western's motion).

81.  Ramirez cannot write his own grievances; he gets help from Tate and others. Ex. 2 (Dec. of D. Ramirez) at ¶ 35.

<u>Ramirez's Current English Ability</u>

82.  Presently, Ramirez has been in the United States for about 7 years and at Western for 6 of those years. *Id.* ¶ 39.

83.  He has learned some English, but he still cannot write a grievance in English. *Id.* ¶ 38.

84.  Ramirez still needs an interpreter to talk to his lawyers and for anything more complicated than the prison's daily routine. *Id.* ¶ 40; Ex. 8 (Final Summary Report: 7/8/2010).

*Undisputed Material Facts*

1.  Plaintiff, Darwin Ramirez (#R-73420) is an inmate of the Illinois Department of Corrections at Western Illinois Correctional Center.

**RESPONSE:** Undisputed.

2.  On October 23, 2013, Plaintiff filed the instant prisoner civil rights lawsuit, pursuant to 42 U.S.C. § 1983.

**RESPONSE:** Undisputed.

3.    Plaintiff was incarcerated at the time of filing the instant lawsuit at Western Illinois Correctional Center.

**RESPONSE:** Undisputed.

*Disputed Material Facts*

None. (Western mischaracterizes many immaterial facts as material.)

*Disputed Immaterial Facts*

4.    Defendants were all employees of the Department at the time the allegations in this lawsuit occurred.

**RESPONSE:**  Disputed and immaterial. Defendant Cynthia Lynch is an employee of Wexford Health Services. Dkt. 62 at ¶ 2.

12.   In September 2010, Plaintiff could speak English well enough to interact with staff.

**RESPONSE:**  Disputed and immaterial. Disputed because, in July 2010, Ramirez required an interpreter for a disciplinary hearing. Ex. 8 (Final Summary Report: 7/8/2010); *see also* Ex. 2 (Dec. of D. Ramirez) at ¶¶ 39-40. Immaterial because "interact" is so general and because whether Ramirez could speak English well enough to interact with staff in 2010 has no bearing on whether the grievance process was available to him.  There is no evidence that staff told him about the grievance process in any language.

13.   The English language skills of primarily Spanish speaking inmates typically improve while incarcerated.

**RESPONSE:**  Disputed and immaterial. Disputed because the "fact" is vague and because there is no evidence that Darwin Ramirez is a

"typical" prisoner. He may not. He never studied English in school and had only been in the United States very briefly before prison. Ex. 2 (Dec. of D. Ramirez) at ¶ 5. Immaterial because even if Ramirez's English improved, there is no evidence to suggest it improved enough to make up for Western's failure to inform him of the grievance process.

15.   Plaintiff never asked Julia Vincent for assistance with a particular grievance.

**RESPONSE:**  Disputed and immaterial. Disputed because, in October 2013, Darwin Ramirez asked Julia Vincent for help with a dental care grievance and Julia Vincent told Ramirez that she would not help him. Ex. 2 (Dec. of D. Ramirez) at ¶ 38; Dkt. 51-5 (entry for 10/15/13). Immaterial because whether Ramirez ever sought help with a particular grievance from Vincent has no bearing on whether the grievance process was available to Ramirez.

18.   Grievance forms are available to inmates at Western Illinois in both Spanish and English, and inmates may write grievances in Spanish or English.

**RESPONSE:**  Disputed and immaterial. Spanish-language forms are not available at Western. Ramirez had never seen one until his attorneys' showed him one produced in litigation. Ex. 2 (Dec. of D. Ramirez) at ¶ 15. Immaterial because Ramirez cannot read in either language, therefore the forms could not have made the process available to him because he could not have read them. Fact ## 22, 24.

*Undisputed Immaterial Facts*

5.    Leslie McCarty is a member of the Administrative Review Board.

**RESPONSE:**  Undisputed but immaterial.

6.    One grievance Plaintiff submitted to the ARB was received on April 8, 2014.

**RESPONSE:**  Undisputed but immaterial. These grievances are immaterial because they post-date the summer of 2013, when Ramirez learned from Carl Tate what a grievance was. Facts ## 73-81. The issue is whether the process was available to Ramirez before it was too late, and these grievances do not bear on that issue. *Id*.

7.    Another grievance Plaintiff submitted to the ARB concerned personal property and was received by the ARB on May 20, 2014.

**RESPONSE:**  Undisputed but immaterial. *See* Response to Fact 6.

8.    The only other grievance Plaintiff submitted to the ARB concerned Plaintiff's outdate and was received August 12, 2014.

**RESPONSE:**  Undisputed but immaterial. *See* Response to Fact 6.

9.    Plaintiff alleges in his amended complaint that he speaks very little English.

**RESPONSE:**  Undisputed but immaterial. Immaterial because, on summary judgment, Ramirez's evidence of his English ability set out in his additional facts controls over his complaint's allegations.

10.   Julia Vincent was a correctional counselor II at Western Illinois from September 2001 to July 2014.

**RESPONSE:**  Undisputed but immaterial.

13

11.   Julia Vincent interacted with Plaintiff on a number of occasions during his incarceration, and recorded those interactions in the cumulative counseling summary of Plaintiff.

**RESPONSE:**  Undisputed but immaterial. Immaterial because Vincent neither declared nor recorded in the summary ever mentioning the grievance process to Ramirez before it was too late. Dkt. 51-5.

14.   In October 2013, Plaintiff asked Julia Vincent about how to obtain assistance with grievances generally, and was told he could just ask a staff member for assistance to receive it.

**RESPONSE:**  Undisputed but immaterial. This does not show that the grievance process was "available" to Ramirez before it was too late. By October 2013 it was too late to grieve the claims in this lawsuit. Facts # 78.

16.   Plaintiff has filed at least five grievances with his counselor during his incarceration at Western Illinois.

**RESPONSE:**  Undisputed but immaterial. *See* Response to Fact 6.

17.   At least three of the grievances Plaintiff has filed during his incarceration at Western Illinois were written in English.

**RESPONSE:** Undisputed but immaterial. *See* Response to Fact 6. Also, these grievances do not show that Ramirez could understand or write in English. They were written by other prisoners. Fact ## 81, 83.

## Argument

Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the [moving party] is entitled to

14

judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they "might affect the outcome of the suit . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). And factual disputes are "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Several familiar rules govern whether a factual dispute is genuine. All reasonable inferences from the evidence must be drawn in the nonmoving party's favor. *Id*. at 255. "Credibility determinations . . . are jury functions, not those of a judge." *Id*. Courts must not discount prisoners' affidavits when they are based on personal knowledge. *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006); *Schaefer v. Bezy*, 336 Fed.Appx 558, 560-61 (7th Cir. 2009) ("because [the prisoner] had personal knowledge of the alleged conversation, his affidavit is sufficient to create a [genuine] factual dispute") (citing *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992)). And, where, as here, the moving party is a defendant seeking summary judgment based on an affirmative defense, that defendant must "establish affirmatively that the evidence is so one-sided that no reasonable factfinder could" find for the plaintiff. *Id*.

Western argues that there are no genuine disputes of fact as to whether Ramirez complied with the PRLA's exhaustion requirement. Dkt. 51 at 1. The exhaustion requirement "is an affirmative defense that the defendants have the burden of pleading and proving." *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004). It provides that "[n]o

action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The availability of a remedy does not depend on the rules and regulations as they appear on paper, but on 'whether the paper process was in reality open for the prisoner to pursue.'" *Salcedo-Vazquez v. Nwaobasi*, 2014 WL 2580517, at *4 (S.D. Ill. June 9, 2014) (quoting *Wilder v. Sutton*, 310 Fed.Appx. 10, 13 (7th Cir.2009)).

Accordingly, to earn summary judgment, Western must prove that an administrative remedy, i.e., the grievance process, was available to Ramirez not just on paper but in reality. And it must prove this by an overwhelming evidentiary margin. It has not done so.

The Court should deny Western's motion for two reasons.  First, because the grievance process was, in reality, unavailable to Ramirez because Western did not tell him about it in a language he could understand. And second, because Western's evidence fails to meet its initial burden to prove that its grievance process was "in reality" available to Ramirez with evidence so overwhelming that no reasonable jury could disagree with it. Rather, Western adduced almost no evidence that the grievance process was available to Ramirez.  Since Western failed to meet this initial burden, its motion fails even if Ramirez's evidence is ignored.

**A.    The Court should deny Western's motion because, in reality, the grievance process was unavailable to Ramirez.**

The grievance process was unavailable to Ramirez for three reasons. First, because *Westefer v. Snyder*, 422 F.3d 570, 579 (7th

Cir. 2005), holds that an administrative remedy is unavailable to a prisoner if the prison fails to provide that prisoner with the information necessary to use the remedy effectively.  Second, because *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002), holds that the exhaustion requirement mustn't be interpreted to allow prisons to exploit it.  And third, because district courts throughout this circuit have extended these principles to situations where, as here, prisons fail to tell Spanish-speaking prisoners how to use the grievance process in Spanish.

An administrative remedy is unavailable to a prisoner if the prison fails to provide that prisoner with the information necessary to effectively use the remedy. *Westefer*, 422 F.3d at 579. In *Westefer*, prisoners sued prison officials to challenge their transfers to Tamms, Illinois's most restrictive prison. *Id*. at 572-73. The officials argued that the prisoners failed to exhaust their administrative remedies by failing to take advantage of "transfer review hearings." *Id*. at 578-79. But the hearings were unavailable because the prisoners "were not told the reasons for their transfer to Tamms . . . [and] [w]e doubt whether the transfer review process is effective for prisoners who do not know the grounds for their transfer and who thus have no basis with which to contest their transfer." *Id*. at 579. Put simply: The prison failed to tell the prisoners information the prisoners needed to effectively use the hearings, so the hearings weren't an available remedy.

The same principal applies here. To use the grievance process at Western, Ramirez had to know that it was there. But he didn't because Western never told him in a language he could understand, despite its legal obligation to do so. Fact ## 29-81; Ill. Admin. Code §§ 504.810(d) ("Offenders shall be informed of the grievance procedure at the admitting facility.") & 504.810(c)(2) ("Each facility shall take reasonable steps to ensure that the grievance procedure is accessible to offenders who are . . . unable to communicate in the English language."). The grievance process's existence, like the grounds for transfer in *Westefer*, was key information necessary to make the remedy available. Because Western failed to inform Ramirez of that key information, it rendered the grievance process unavailable to him.

Moreover, allowing Western to keep prisoners in the dark about the grievance process and then use it against them when they sue—exactly what Western seeks here—interprets the exhaustion requirement in a way that makes it easy for prisons to exploit, something the Seventh Circuit has refused to do: "[W]e refuse to interpret the PLRA so narrowly as to  . . . permit [prison officials] to exploit the exhaustion requirement." *Lewis*, 300 F.3d at 833 (alteration in original) (internal citation omitted). *Lewis* held that a prison rendered its grievance process unavailable to the plaintiff by failing to timely respond to his grievance. *Id.* A grievance that hasn't been responded to can't be appealed, and a grievance can't be exhausted until it is appealed. So by not responding to grievances, prisons can

prevent prisoners from appealing, which prevents them from exhausting, which precludes them from suing. *Lewis* recognized this as unfair and therefore "refused" to allow it.

Ramirez's situation is analogous. Prisons can unfairly prevent prisoners from exhausting and suing by refusing to inform them of the grievance process in understandable language. This is just as easy and just as much exploitation as refusing to respond to individual grievances. In both situations, the prison just keeps mum. The rationale in *Lewis*, thus, condemns Western's motion.

Finally, district courts throughout this circuit have applied that rationale, and the one at work in *Westefer*, to cases, like this, that turn on language barriers. These cases uniformly recognize that "[a] prisoner's lack of familiarity with English may excuse a failure to exhaust administrative remedies where the prisoner is given insufficient assistance by prison officials to enable the prisoner to satisfy the grievance process." *Aleman v. Dart*, 2012 WL 488068, at *5 (N.D. Ill. Feb. 14, 2012).

Along those lines, courts-including this one-have denied summary judgment after finding that administrative remedies weren't available to Spanish-speaking prisoners housed in prisons that made little effort to assist them in Spanish. *Salcedo-Vazquez*, 2014 WL 2580517 at *1 (denying summary judgment); *Bojorquez v. Fitzsimmons*, 2009 WL 790950, at *5 (C.D. Ill. Mar. 23, 2009) (same); *Abel v. Pierson*, 2008 WL 509466, at *4 (S.D. Ill. Feb. 13, 2008) (same); *see also Albino v. Baca*. 747 F.3d 1162, 1173-76 (9th Cir. 2014) (en banc) (reversing

summary judgment on exhaustion because prison failed to inform
Spanish-speaking detainee of the grievance process).

Ramirez's claim that Western's grievance process was unavailable
to him is even stronger than the claims in these prior cases.
*Salcedo-Vasquez*, *Bojorquez*, and *Abel* all involved plaintiffs who knew
that the grievance process existed and were all able to start the
process. *Salcedo-Vazquez*, 2014 WL 2580517 at *1-3 ("Defendants point
out that Plaintiff in fact was able to follow the grievance process
[before]"); *Bojorquez*, 2009 WL 790950 at *1 ("The plaintiff submitted
a total of four grievances during the relevant time frame."); *Abel*,
2008 WL 509466 at *4 (prisoner filed grievance in Spanish). Despite
that knowledge, the grievance process was still unavailable to those
plaintiffs because the prisons didn't do enough to ensure that the
plaintiffs knew how to properly grieve. *Id*. Here, Ramirez had no idea
that the process even existed, much less how to properly use it. Fact
## 29-81. If not being told how to grieve renders the process
unavailable, then so must not being told how to grieve *plus* not being
told that the process exists.

Even cases that ultimately reject plaintiffs' language arguments
recognize that the principle underlying those arguments is valid.
*Aleman*, 2012 WL 488068, at *5 ("[a] prisoner's lack of familiarity
with English may excuse a failure to exhaust administrative
remedies"); *Lang Vo Tran v. Illinois Dep't of Corr.*, 2011 WL 816630,
at *8 (S.D. Ill. Mar. 1, 2011) (same); *see also Hassan v. Squeo*, 2014

WL 539710, at *3-4 (N.D. Ill. Feb. 11, 2014). These cases just find that the principle doesn't apply on the particular facts.

In those cases, the plaintiffs plainly knew more about the grievance process than Ramirez. For example, in *Aleman* and *Lang Vo Tran*, the plaintiffs had filed grievances before or in connection with the issues in their lawsuits. *Aleman*, 2012 WL 488068, at *2; *Lang Vo Tran*, 2011 WL 816630 at *1 ("Tran made two attempts to grieve his complaints concerning the medical treatment he received for his hernia."). Both plaintiffs knew enough about the process to know that they should have asked prison staff for help. *Id.* They just chose not to. *Id.* Ramirez had no reason to ask staff about the grievance process because he didn't know it existed until it was too late. Fact ## 77-78. In *Hassan*, the plaintiff admitted "that he understood the grievance process, [and] that he read the rules on the form." After that admission, the plaintiff's contrary argument about his limited English, understandably, didn't go far. *Hassan*, 2014 WL 539710 at *2. Ramirez, on the other hand, has made no such admission. The grievance process simply was not available to him.

**B.    Alternatively, the Court should deny Western's motion because Western failed to adduce sufficient evidence that its grievance process was available to Ramirez.**

Western's burden was to "establish affirmatively that the evidence is so one-sided that no reasonable factfinder could" find that the grievance process was unavailable to Ramirez. *See*, *e.g.*, *Schaefer*, 336 Fed.Appx at 560-61. To do so, Western needed to adduce

at least some evidence that the grievance process was available to
Ramirez during the relevant time period. It didn't.

In its brief, Western points to two categories of evidence it
claims show that the grievance process was available to Ramirez:
grievances Ramirez filed and "assistance" that "was available to" him.
Dkt. 51 at 7-8. The grievances are irrelevant. Every one of them is
from late 2013 or later. Fact ## 73-81. That is well after the 60-day
deadline to grieve the issues in this lawsuit elapsed. Fact # 78.
Accordingly, these grievances do not show that the grievance process
was available to Ramirez in time to use it, only that he learned of it
years later.

Similarly, Western's alleged "assistance" evidence misses the
point. The point is that Ramirez never learned of the grievance
process in time to grieve the issues in this case. And, since he
didn't know about it, there was no reason for him to seek assistance,
even if it was there. Without evidence that Western told Ramirez about
the grievance process, the assistance evidence is immaterial.

It is also weak. Western asserts that Julia Vincent was there to
help Ramirez with grievances. Dkt. 51 at 8.  But when Ramirez asked
her for help with a grievance in 2013, Vincent refused. Response to
Fact # 15. Next, Western points to the Spanish language grievance
forms. Dkt 51 at 8-9. But they have no evidence about what the forms
say or whether and how they were distributed. And, what's more,
Ramirez never saw one. Fact # 61. Even if he had it would not have

made the grievance procedure available to him because he cannot read. Fact # 24, 30, 31.  A fact Western ignores.

Finally, Western insists that prisoners' English just gets better over time and that, per Vincent, Ramirez could speak enough English to "interact" with staff in 2010. Dkt. 51 at 8-9. Missing is any evidence or explanation for why better English or being able to interact with staff gives Ramirez knowledge of, and thus access to, the grievance process.  Moreover, these statements are contested. Response to Fact ## 12-13. This evidence doesn't help Western meet its burden.

Western's failure to meet its burden may be because Western did not realize that it had the burden. Western's statement of the summary judgment standard is wrong on this score. Dkt. 51 at 4 ("The plaintiff must come forward with evidence . . . otherwise the court must enter summary judgment"). It mistakes this case–where the moving party has the burden at trial (because defendants bear the burden on affirmative defenses like exhaustion)–for the case where the nonmoving party bears the burden at trial. Elsewhere, Western explicitly suggests that Ramirez has the burden: "[Ramirez] has failed to show the grievance process was made unavailable to him." Dkt. 51 at 8. Whatever the reason for Western's insufficient showing, summary judgment should be denied because of it.

**C.    The Court should reject any attempt by Western to rely on *McCoy v. Gilbert* in its reply brief.**

In reply, Western may cite *McCoy v. Gilbert*, 270 F.3d 503 (7th Cir. 2001), to argue that the grievance process was available to Ramirez even though he learned of the process's existence after the

deadline to grieve the claims in his complaint had passed. In *McCoy*, the plaintiff was injured, the grievance deadline for that injury passed, the PRLA was enacted, and the plaintiff sued, in that order. *Id.* at 507-08. The plaintiff argued that, by the time he learned of the exhaustion requirement (i.e., when the PRLA was enacted) his deadline to grieve had elapsed and so he had no available administrative remedy. *Id. McCoy* rejected this argument because the plaintiff could have filed an untimely grievance under a "hardship exception" to the deadline. *Id.* at 510-511.

Western may use *McCoy* to argue that the "good cause" exception to the 60-day deadline for filing grievances in Illinois means that Ramirez could have grieved the claims in this case after Carl Tate told him about the grievance process in 2013, even though the deadline was passed.[2] That is not the law. If it were, then *McCoy* would conflict with many other Seventh Circuit cases. *Hurst v. Hantke* is one: "[A]n administrative remedy that would be forfeited for failure to comply with a deadline that in the circumstances could not possibly be complied with would not be 'available' within the meaning of 42 U.S.C. § 1997e(a)." 634 F.3d 409, 412 (7th Cir. 2011).

And another is *Lewis*. This potential reading of *McCoy* would conflict with *Lewis* because the plaintiff there could have waited for a response to his grievance, no matter how long delayed, and then

---

[2]  This argument fails because it misreads *McCoy* and also because it was Carl Tate, and not Western, that told Ramirez about the grievance system: "Assistance from other inmates cannot be a substitute for assistance from actual jail personnel." *Salcedo-Vasquez*, 2014 WL 2580517 at *4.

argued for a "good cause" exemption from the 60-day deadline. The reading would also conflict with *Dale v. Lappin*. 376 F.3d 652 (7th Cir. 2004). *Dale* held that the prison defendants failed to show that administrative remedies where available to the plaintiff. *Id*. This holding was based on the plaintiff's declaration that the officials refused to give him the required grievance forms until after his grievance deadline passed. *Id.* at 653-55, 656. This reading of *McCoy* would conflict with this holding because the *Dale* plaintiff could have used the same hardship exception at issue in *McCoy* and just submitted his late grievance when he finally received the forms.

The correct reading of *McCoy* is reconcilable with other precedents. Ultimately, the Seventh Circuit held against *McCoy* "because . . . McCoy has always had the opportunity to exhaust, but he simply chose not to." *McCoy*, 270 F.3d. at 508. In other words, the *McCoy* plaintiff always had the opportunity to timely grieve. What changed for him, with the passage of the PRLA, was his incentive to do so—not his ability. This separates the McCoy plaintiff from the plaintiff in the other cases, who lacked the opportunity, and from Ramirez, who never had to the ability, and thus the opportunity, to timely grieve. Accordingly, the Court should reject any attempt by Western to rely on *McCoy*.

**Conclusion**

For all the foregoing reasons, summary judgment should be denied, and the case should be set for an evidentiary hearing on exhaustion as required by *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008).

RESPECTFULLY SUBMITTED,

/s/ Thomas Kayes
Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Roshna Bala Keen
Sarah Grady
Thomas Kayes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF TYPE VOLUME LIMITATION COMPLIANCE**

I, Thomas Kayes, am the attorney primarily responsible for this memorandum. I certify that it complies with the type volume limitation under Central District Local Rule 7.1(B)(4)(c). It has 6,083 words, 36,721 characters (including spaces), 646 lines, and is in a monospaced font. To identify these figures, I relied on the "Word Count" feature of MS Word. This includes every part of the memorandum, but does not include this certification or the proof of service below.

So Certified.

/s/ Thomas Kayes

**CERTIFICATE OF SERVICE**

I, Thomas Kayes, an attorney, certify that on December 15, 2014, I served **PLAINTIFF DARWIN RAMIREZ'S RESPONSE TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON EXHAUSTION** on the counsel and as-yet unrepresented parties listed below by placing them in US mail with first class postage affixed and filing with the CM/ECF system.


/s/ Thomas Kayes
Thomas Kayes
Attorney for Plaintiff


Ms. Ashley Carter
Office of the Illinois Attorney General
500 S. Second Street
Springfield, Illinois 62706

Mr. Michael T. Kokal
Mr. John D. Hoelzer
Heyl, Royster, Voelker & Allen
3131 Wabash Avenue
P.O. Box 9678
Springfield, IL 62791-9678

Unrepresented Defendants:
Mr. Jeff Korte
Mr. Jay Alexander